BEN SOEP COMPANY, INC., on Behalf of Itself and All Other Holders of Trust Claims Similarly Situated, Plaintiff, v HIGHGATE HALL OF ORANGE COUNTY, INC., et al., Defendants.

Supreme Court, Monroe County, December 14, 1988

APPEARANCES OF COUNSEL

*Bond, Schoeneck & King (S. Paul Battaglia* of counsel), for plaintiff. *Harter, Secrest & Emery (Bruce E. Hansen* of counsel), for Marine Midland Bank, defendant. *Dubin, Sommerstein & Hunter (Robert B. Sommerstein* of counsel), for Industrial Investment Trust, defendant.

**OPINION OF THE COURT**

RAYMOND E. CORNELIUS, J.

The plaintiffs, including Ben Soep Company, Inc., are members of a certified class of 24 subcontractors and materialmen who performed labor and/or furnished materials, and also filed mechanics' liens, in connection with a project known as Strathallan Manor, located on East Avenue in Rochester, New York. The amended complaint alleges that the project owner, Highgate Hall of Orange County, Inc., diverted $600,000, which represented statutory trust funds under article 3-A of the Lien Law, for payment of an indebtedness to the defendant, Industrial Investment Trust. This amount constituted proceeds from building loans made to Highgate Hall of Or-

ange County, Inc. by the defendant, Marine Midland Bank-Rochester, which allegedly participated in the diversion. Both the plaintiffs and the defendant, Marine Midland Bank-Rochester, have made motions for summary judgment, pursuant to CPLR 3212.

The project originally consisted of a plan to construct a seven-story, 168-room hotel. On September 29, 1972, Highgate Hall of Orange County, Inc. received an unsecured loan from Marine Midland Bank-Rochester in the amount of $150,000 for purposes of land acquisition and working capital. Thereafter, on November 20, 1972, a building loan was made, from the bank to the project owner, in the amount of $3,675,000. A second building loan was made on September 11, 1975 in the amount of $900,000, and $491,134 of this amount was advanced at that time to pay subcontractors. Plaintiffs contend that, as of the final closing of the two building loans on October 6, 1975, $697,823 remained undisbursed under both loans, including approximately $194,000 of retainage withheld and payable to subcontractors under the first loan. Between September 11, 1975 and October 6, 1975 work continued on the building, which allegedly resulted in an additional $468,000 owed to subcontractors.

At the time of closing on October 6, 1975, the law firm of Harter, Secrest & Emery, attorneys for Marine Midland Bank-Rochester, prepared and delivered two checks payable to the order of Highgate Hall of Orange County, Inc. The first check was made payable in the amount of $297,823, representing the undisbursed amount, including retainage, under the first building loan, and a second check for $302,177, which constituted proceeds of the second loan. These two checks, which totaled $600,000, were then endorsed and made payable to the order of Marine Midland Bank-Rochester by Charles Brennick, as president of Highgate Hall of Orange County, Inc. Pursuant to Mr. Brennick's instructions, the bank then wired the amount of $600,000 to the Industrial Investment Trust, a real estate investment trust in Massachusetts and admittedly a nonbeneficiary of any trust funds under the Lien Law. Counsel for the trust, in an affidavit submitted in connection with the pending motions, asserts that the amount of $600,000 had been loaned earlier in 1975 to Charles Brennick, as evidenced by a promissory note. It should be mentioned that the complaint against the individual trustees has heretofore been dismissed for failure to state a cause of action, but

sustained against the trust.* In addition, Highgate Hall of Orange County, Inc. and Charles Brennick were not served in this action because of their respective petitions in bankruptcy.

The project was initially scheduled for completion in September 1974. However, there were modifications, including addition of an eighth floor, together with delays and cost overruns. Ultimately, there were extensions of the permanent mortgage closing date, as well as an increase in the amount thereof. Also, during this period of time, there were indications of financial problems, and concern expressed concerning the outstanding loans. For example, the loan review comments of the bank, dated February 19, 1974, described the unsecured loan of $150,000 as exhibiting "evidence of serious trouble and involving an element of possible loss", and further indicated that "although Charles Brennick possessed substantial worth in nonliquid assets, he also had very heavy debt". Sometime prior to the final closing in 1975, the loan review comments, in regard to this unsecured loan, further indicated that the project had been "beset by problems" including cost overruns and subcontract trouble.

During construction, an assistant secretary of Marine Midland Bank-Rochester was assigned the responsibility for general oversight of the building loan and following the project's progress. Before making advances under the building loan, the bank would customarily receive a statement from the architect certifying that the amount requested by the contractor represented payment for work actually performed. The assistant secretary for the bank would then conduct an independent inspection of the project, and advances would ordinarily be made by a deposit in an account maintained by Highgate Hall of Orange County, Inc. at Marine Midland Bank-Rochester.

Pursuant to its usual business practice, the bank also requested and maintained, in its file, a list of subcontractors on the project. Also, the bank file contained newspaper clippings of mechanics' liens filed against the project. Another list maintained in the commercial file of Marine Midland Bank-Rochester consisted of accounts payable, together with the approximate amount owed to each subcontractor for work already performed, as well as work to be completed. Thus, for instance, on or about July 30, 1975, the list of accounts payable indicated a total amount of $428,000 owed to 23

---

* *Soep Co. v Highgate Hall,* 71 AD2d 825 (4th Dept 1979).

accounts, and an estimated cost of $468,000, payable to 11 accounts, in order to complete the project. The accounts payable formed the basis, in part, at least, for the recommendation to increase the loans, which was approved by the bank's executive committee on September 11, 1975. In addition to the aforementioned list of accounts payable, Charles Brennick had exhausted his personal line of credit in the amount of $1,200,000.

The plaintiffs contend that Marine Midland Bank-Rochester had actual knowledge of the diversion of $600,000 in trust funds to the Industrial Investment Trust. In the alternative, plaintiffs advanced the position that the bank had constructive notice, or knowledge of facts sufficient to require a duty to inquire concerning the true facts. In support of both theories, which are the basis for the motion for summary judgment, reliance is placed upon many factors. These include the fact that the Industrial Investment Trust did not appear on the list of subcontractors or accounts payable, the financial difficulties of the project owner and its president, the large amount paid in comparison to amounts paid to subcontractors, and the failure to follow procedures, which have been described above, before making advances on the building loan.

■ As a general rule, a bank, which knowingly assists a trustee to convert a fiduciary account for other than trust purposes, becomes liable therefor. *(Grace v Corn Exch. Bank Trust Co.,* 287 NY 94 [1941]; *Bischoff v Yorkville Bank,* 218 NY 106 [1916].)* Proceeds from a building loan, received by the owner of a construction project, constitute trust funds for the benefit of contractors, subcontractors, laborers and materialmen for claims arising from improvement to the project. (Lien Law §§ 70, 71.) Thus, although a bank, in which trust funds, under the Lien Law, are deposited, has no duty to inquire whether a fiduciary is properly applying such funds, liability will be imposed if "the bank has notice of a threatened misappropriation and with that notice aids in the misappropriation." *(Aetna Cas. & Sur. Co. v Lafayette Natl. Bank,* 35 AD2d 137, 141 [1st Dept 1970], *affd* 30 NY2d 638 [1972].)* In the pending case, it is readily apparent that Marine Midland Bank-Rochester aided in the diversion of the trust funds, by following the directive to wire the $600,000, but the question remains whether the bank had knowledge thereof.

Obviously, if a bank had actual knowledge that a fiduciary was diverting trust funds, on deposit, there would be liability for any loss to beneficiaries. In addition, decisions have held

that a bank may be charged with constructive knowledge if it has knowledge of facts "of such a character as would lead a person of reasonable prudence and caution to suspect that trust funds then on deposit are about to be misappropriated", and it fails to make a reasonable inquiry to ascertain the true facts. *(Newton v Scott,* 254 App Div 140, 143 [4th Dept 1938].) Both concepts, actual and constructive knowledge or notice, have been applied to trust funds held under the Lien Law. *(See, Eljam Mason Supply v I. F. Assocs. Corp.,* 84 AD2d 720 [1st Dept 1981]; *Northern Structures v Union Bank,* 57 AD2d 360 [4th Dept 1977]; *Gramatan-Sullivan, Inc. v Koslow,* 143 F Supp 641 [SD NY 1956], *affd* 240 F2d 523 [2d Cir], *cert denied* 353 US 958 [1957].) In this court's opinion, however, these decisions do not always make clear the distinction between constructive knowledge and circumstantial evidence of facts, from which a trier of fact may conclude that one possessed actual knowledge of a diversion of trust funds. For example, in *Gramatan-Sullivan, Inc. v Koslow (supra),* the court concluded that there was "no doubt" that a defendant knew that checks paid to him represented funds received by the contractor. The court also held that the defendant may be "charged with notice of the diversion" (143 F Supp, at 646), and then acknowledged that there was no direct proof of actual knowledge, but stated that the defendant was "chargeable with notice if the circumstances were such as to put him on inquiry" (143 F Supp, at 646, citing *Bischoff v Yorkville Bank, supra).* Similarly, in *Newton v Scott (supra,* at 143), the court acknowledged that "[a]ctual notice may be proved by direct evidence or it may be inferred or implied." Nevertheless, the court then proceeded to discuss knowledge of circumstances, which would make a bank chargeable with knowledge, because of the failure to make reasonable inquiry.

The distinction between actual and constructive notice becomes important because the Court of Appeals, following enactment of the Uniform Commercial Code, has held that a subjective, not objective, standard is to be applied to section 72 of the Lien Law. This section, in effect, protects the rights of a holder in due course of a negotiable instrument or a purchaser in good faith for value and without notice that a transfer to him constitutes a diversion of trust assets. Therefore, the court held that notice of facts, which would otherwise create a duty of inquiry, does not bar good-faith status under this section. *(I-T-E Imperial Corp.—Empire Div. v Bankers Trust Co.,* 51 NY2d 811 [1980].)

The defendant relies upon the decision in *I-T-E Imperial Corp. v Bankers Trust Co. (supra)* in support of its motion for summary judgment. However, it is important to note that the Court of Appeals cited *Chemical Bank v Haskell* (51 NY2d 85 [1980]) as authority and basis for its decision. This latter case did not involve the Lien Law, but did specifically address the issue of knowledge, or notice, for purposes of the definition of a holder in due course under UCC 3-302 and 3-304. The court specifically recognized that the general definition of "notice", as contained in UCC 1-201 (25) (c), may constitute an objective or reasonable person standard. This particular section charges one with knowledge of a fact if "from all the facts and circumstances known to him at the time in question he has reason to know that it exists." Nevertheless, the court also proceeded to emphasize that the language contained in UCC 3-304 (7), which applies specifically to a purchaser of a negotiable instrument, only speaks in terms of "knowledge" and not reason to know. Therefore, the court concluded that the objective test did not apply to a purchaser of a negotiable instrument and, accordingly, there would be no duty to make inquiry.

██ Based upon the above analysis, this court holds that a bank, which participates in a diversion of trust assets, under the Lien Law, may be held liable to the beneficiaries premised upon either actual or constructive knowledge. However, in regard to liability based upon constructive knowledge or notice, resulting from a failure to make reasonable inquiry, this would be limited to situations in which either the bank was not a holder in due course, or, in the alternative, the diversion was not accomplished by means of a negotiable instrument and the bank was not otherwise a purchaser in good faith for value, as defined in Lien Law § 72. Of course, this may beg the question, because one may not be a holder in due course or purchaser in good faith for value if he had actual notice or knowledge of a defect or defense.

In the pending case, it would appear that the diversion of $600,000 in trust funds to the Industrial Investment Trust was not accomplished by negotiation of the two checks, which were issued by counsel for Marine Midland Bank-Rochester, but rather the separate wiring of funds by the bank. Although the court can make certain assumptions as to the transactions between the time it received the two checks and the manner in which the $600,000 was forwarded, the record, on this

motion for summary judgment, is insufficient to make a determination whether the checks were actually used to accomplish the diversion. *(Cf., I-T-E Imperial Corp.—Empire Div. v Bankers Trust Co., supra.)* In any event, proof of actual knowledge, on the part of the bank, would be sufficient to establish liability. Furthermore, to the extent that plaintiffs rely upon the concept of constructive notice or knowledge, and assuming that negotiable instruments were utilized to accomplish diversion, actual knowledge would preclude the bank from being a holder in due course or purchaser in good faith for value. The court has concluded that there are sufficient circumstantial facts, from which a trier of fact could conclude that the bank had actual knowledge of the diversion of trust funds. However, this is a question of fact, which cannot be resolved on the cross motions for summary judgment.

■ The court agrees with plaintiffs that Lien Law §§ 13 and 22, to which reference is made in the first affirmative defense by the defendant, Marine Midland Bank-Rochester, do not constitute a defense to this action for participation in diversion of trust funds, pursuant to Lien Law § 77. Lien Law § 13 (2) merely provides that advances under a building loan are superior to subsequently filed notices of mechanics' liens, conditioned upon the filing of a verified statement, setting forth the amount available from the building loan proceeds, pursuant to Lien Law § 22. Lien Law § 13 (3) simply requires that the building loan mortgage contain a covenant, by the mortgagor, to receive advances thereunder as trust funds for the purpose of paying the cost of improvement, and provides that *"[n]othing in this subdivision* shall be considered as imposing upon the lender any obligation to see to the proper application of such advances" (emphasis added).

■ The second affirmative defense, contained in the amended answer of the defendant, Marine Midland Bank-Rochester, asserts that the action is barred, as a matter of law, because it was not commenced within one year after completion of the improvement, as required by Lien Law § 77 (2). This one-year period begins to run from the date of completion of all work, and not from the date of substantial completion. *(Northern Structures v Union Bank,* 57 AD2d 360, 368, *supra.)* The copies of verified notices of mechanics' liens, attached to plaintiffs' supplemental affidavit, would indicate that work was being performed after October 1, 1975, and,

therefore, at the very least, a question of fact exists as to when the work was actually completed.

Finally, plaintiffs' claim that the bank also participated in diversion of $80,000 of trust funds, under the original unsecured loan, is not covered by the complaint and, therefore, is not before the court.